Ronald S. COLEMAN, Appellant,

v.

UNITED STATES, Appellee.

Nos. 98–CF–13, 98–CO–517.

District of Columbia Court of Appeals.

Argued March 27, 2001.

Decided Aug. 23, 2001.

---

Sandra K. Levick, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Ryan H. Rainey, Assistant United States Attorney, for appellee. Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Mary–Patrice Brown, Pat M. Woodward, and Mary B. McCord, Assistant United States Attorneys, were on the brief for appellee.

Before STEADMAN, REID and WASHINGTON, Associate Judges.

STEADMAN, Associate Judge:

Appellant was convicted of felony malicious destruction of property for setting his father's house on fire. D.C.Code § 22–403 (1996 Repl.). During cross-examination, appellant's sister blurted out that appellant had set fires before in that same house. On appeal, he contends that the trial court erred in refusing to grant a mistrial or give an immediate instruction to the jury. The trial court did give a corrective instruction the next day at the end of the government's case. We agree with appellant that in the special circumstances of this case, an immediate cautionary instruction was required if a mistrial was not granted.

## I.

The government presented evidence that appellant asked two of his sisters, one of whom, Gloria Hill, lived with their father in a row house, for some money to take his daughter on a field trip. Although both declined, appellant ended up in his father's home with Ms. Hill. After going upstairs into a bedroom at the rear of the house with a cigarette in hand, appellant returned and asked Ms. Hill to take a walk with him. Approximately ten minutes later, Ms. Hill returned to the home alone, only to find that the house

was on fire, with smoke emanating primarily from the second floor.

The relevant testimony involves the cross-examination of Denise Coleman, another of appellant's sisters, in which defense counsel began probing the witness regarding her potential bias against appellant:

Q. You were very upset that their house had been burned down, right?

A. Oh yes, I was.

Q. When your sister Gloria told you that she thought that Ronald had something to do with that, you became very upset with your brother Ronald, right?

A. Yes, I became upset with Ronald because *he set fires before in our house.*

(emphasis added).

After the comment regarding appellant previously setting the house on fire came out, defense counsel immediately objected and asked for a mistrial on the ground that the statement was non-responsive and highly prejudicial. The following colloquy took place:

Ms. Chutkan: Your honor, I believe that is definitely grounds for a mistrial. Your honor, I very strongly would move for a mistrial.

The Court: I will deny your motion. I will deny the motion.

Ms. Chutkan: ... If the Court is going to deny my motion for a mistrial, I would like an instruction that the last remark was improper and the jury should disregard it....

The Court: This is not the last witness that they will hear. I will have plenty of opportunity for me to instruct

them. If I give an instruction, it will have the effect of erasing this.

Ms. Chutkan: Your Honor, I think that the case law guides us with respect to limiting instructions and correcting instructions which have said that ... when there is prejudicial information such as this [an instruction] should be given as soon as possible after the witness testifies.

The Court: ... Let me think about it for just a minute. I will have this witness step down and we will take the testimony of the next witness[.]

When counsel resumed her questioning of Ms. Coleman, she asked her: "Ma'am, the reason that you just started to talk about your brother setting other fires in the house is because you want to make sure that your brother is convicted of this crime, right?" Ms. Coleman simply responded, "I want my brother to get some help." [1] Although counsel and the trial court discussed the issue again at the end of the day, no resolution was reached.

The following day, counsel again attempted to convince the judge:

At the time I asked if the Court was going to deny the mistrial and give an instruction, [that] it be done then right after the witness testified. Because the Court of Appeals has indicated that is the appropriate time to give the instruction when witness's testimony is still fresh in the jurors' minds.... I'm still requesting if the Court is going to deny my motion for mistrial, I'm requesting that the Court tell the jury they are to disregard and completely put out of their minds Ms. Coleman's statement that Mr. Coleman had made-set previous fires in the past. It was non-responsive

1. Counsel asked one additional immediately preceding question: "Q. You want to see your brother convicted, don't you, ma'am? A. I would like to see my brother get some mental treatment."

to a question. It is completely irrelevant and extremely prejudicial.

After some further discussion, the trial court agreed to instruct the jury but not until the conclusion of the government's case. The objected-to statement by Ms. Coleman had come out during testimony the afternoon of November 17. Following her testimony, four more witnesses testified for the government that day and the following day. These included the appellant's father, another sister, a court clerk, and the government's expert witness, an arson investigator for the D.C. Fire Department who testified at length concerning his investigation into the cause of the fire and his conclusion that it was not accidental but intentional. The instruction was finally given late in the afternoon of November 18, as follows:

> You might recall that Denise Coleman in responding to a question or two put I believe by Ms. Chutkan, spoke about her understanding of a previous fire set at the house by the defendant. You should disregard that testimony. Don't let that enter into your deliberations at all. Just put it to one side. Just disregard it, ladies and gentlemen.

There was no objection made to the instruction as given.

**2.** In *Johnson*, we expressly adopted FED. R.EVID. 403 in applying the balancing test for admissibility of "other crimes" evidence. However, our approach to other crimes evidence is somewhat different from FED.R.EVID. 404(b), which we have observed reflects a policy of "presumed admissibility." *Groves v. United States*, 564 A.2d 372, 375 n. 5 (D.C. 1989). To be sure, in our jurisdiction, "other crimes" evidence may be admitted where relevant to a wide range of issues, such as intent, identity, motive, absence of mistake or accident, or common scheme or plan, and where its probative value is not substantially outweighed by prejudice. *Johnson*, 683 A.2d at 1092–93. The government now suggests that

## II.

As the government itself agrees, Ms. Coleman's assertion that appellant had previously (and, by the use of the plural "fires," apparently more than once) set the house on fire comes under the familiar rubric of "other crimes" evidence. *See Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). Thus, as our en banc court reaffirmed in recent years,

> [i]t is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose.

*(William) Johnson v. United States*, 683 A.2d 1087, 1092 (D.C.1996) (quoting *Drew*, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90) (emphasis in original).[2] The ordinary concern about the admission of any type of other crimes evidence is significantly elevated in the case now before us, where the testimony related to the commission by the defendant of the exact same offense at the exact same location on (it could be interpreted) at least two previous occasions, and was testified to by appellant's own sister, a strong mark of veracity.[3]

the prior actions of appellant might have been admissible in any event under one or more of those exceptions. But no such argument was made for the trial court to consider and rule upon. We proceed on the assumption of inadmissibility.

**3.** The government contends that it was defense counsel's probing questions that led to the particular testimony that was given, and therefore should preclude appellant from now arguing that the testimony should be the basis for reversal. *See Parker v. United States*, 757 A.2d 1280, 1286–87 (D.C.2000), and *Gonzalez v. United States*, 697 A.2d 819, 826 (D.C.1997) (defendant cannot complain of being preju-

■ A trial court, presented with a situation where inadmissible evidence has unexpectedly been put to the jury, essentially has three corrective options: to declare a mistrial, to give an immediate instruction, or to postpone such action until a later point. The trial court's discretion in this regard is considerable. *Carpenter v. United States*, 430 A.2d 496, 506 (D.C. 1981). We observed in that case:

[T]he possibility of inadmissible testimony being uttered inadvertently in front of the jury is a constant but acceptable risk inherent in all oral testimony. . . . 'Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. A defendant is entitled to a fair trial but not a perfect one.'

*Id.* (quoting *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).

■ With respect to the mistrial option, we will reverse the trial court's denial of a motion for a mistrial only if it "appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Bragdon v. United States*, 668 A.2d 403, 405 n. 2 (D.C. 1995). "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Peyton v. United States*, 709 A.2d 65, 69 (D.C.1998); *see also, e.g., Clark v. United States*, 639 A.2d 76, 79 (D.C.1993) (citing *Beale v. United States*, 465 A.2d 796 (D.C.1983), for the proposition that the trial court's decision should be reversed only in "extreme situations"). In assessing the potential prejudice to appellant, we look to several factors:

the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court, all the while giving due deference to the decision of the trial judge, who had the advantage of being present not only when the alleged misconduct occurred, but throughout the trial.

*Bennett v. United States*, 597 A.2d 24, 27 (D.C.1991). Here, the trial court decided that an appropriate instruction would suffice and that it would give one. *See Peyton*, 709 A.2d at 72–74 (prompt and complete instruction, rather than mistrial, was appropriate after witness blurted out that he passed a lie detector test); *Bennett*, 597 A.2d at 27 (indicating that the prejudice to appellant is diminished if the trial court, in response to a motion for a mistrial, instead instructs the jury to disregard the damaging question and answer).[4]

---

diced by a situation which he created). Contrary to the government's assertion, however, the initial question that elicited the response was, as appellant suggests, designed to delve into Ms. Coleman's possible bias. It required a simple yes or no response, and did not invite the inflammatory remark given. When questioning resumed, however, defense counsel repeated the very statement that she complained of. While ordinarily this could be a problem, in this case, given the trial court's ruling that it would not give an instruction or declare a mistrial at the time, counsel had the right to attempt to rehabilitate appellant. Asking Ms. Coleman the additional question tried to do just that. Because of the very nature of cross-examination, undue limitations should not be placed on counsel's ability to elicit information from witnesses, particularly when attempting to impeach them with bias against the defendant. *See, e.g., Bronston v. United States*, 409 U.S. 352, 358, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) ("cross-examination in particular, is a probing, prying, pressing form of inquiry").

4. To be sure, as in *Bennett* itself, we have reversed cases where we have determined that *Drew* evidence was improperly admitted by the trial judge, but in such circumstances

■ In our view, the determinative question here is whether the trial court's timing of the instruction [5] was sufficient in the circumstances. It is, of course, the "almost invariable assumption of the law that jurors follow their instructions." *Plater v. United States*, 745 A.2d 953, 959 (D.C.2000) (citations omitted). "The jury is presumed to follow the trial judge's instructions.... [T]his is a crucial assumption, for our theory of trial depends on the jury's ability to do so." *Thompson v. United States*, 546 A.2d 414, 425 (D.C. 1988). The trial court did indeed at a later point in the trial instruct the jury to ignore the inadmissible evidence, and ordinarily that might be sufficient. Was the inadmissible evidence here of so prejudicial a nature that only an immediate corrective instruction would suffice in lieu of a mistrial?

Appellant directs our attention to two cases, both more than forty years old, which indicate that the timing of a corrective instruction might be determinative. In the first case, *Yeldell v. United States*, 153 A.2d 637 (D.C.1959), a police officer twice referred to the defendant's parole officer, first on cross-examination and again on redirect. This court reversed: "[w]hen he volunteered the information about the parole officer, the court should have cautioned him and *immediately instructed the jury* to disregard that portion of his answer, or, in the alternative, the judge should have granted defendant's motion for a mistrial." *Id.* at 638 (emphasis added).[6]

In the second case, *Baldi v. Nimzak*, 158 A.2d 915 (D.C.1960), a case involving slander, one of appellee's witnesses testified regarding a statement that was slanderous per se but was made after the complaint was filed and therefore inadmissible. Although the motion for a mistrial was timely made, the trial court waited until the trial was over before giving a "disregard" instruction. Citing *Yeldell, supra,* the court concluded that the revelation of this type of inadmissible testimony warranted either a mistrial or an immediate instruction. "Unless adequate precautions are taken to immediately correct errors of this nature when they occur we do not think that instructions at the termination of all the evidence are sufficient to divest from the mind of the jury the weight and credibility it accorded the prejudicial evidence when introduced." 158 A.2d at 917.[7]

A much more current example of this sort of consideration may be found in *Peyton, supra.* There, a key prosecution witness volunteered that he had been given a "lie detector" test. In this jurisdiction, any reference to such tests is clearly inad-

---

no corrective instruction was of course involved as an alternative. *See, e.g., Robinson v. United States*, 623 A.2d 1234 (D.C.1993). In any event, we need not rule definitively on the mistrial issue in this case, given our holding with respect to the faulty timing of the instruction.

5. No objection was made to the form of the instruction as given. On appeal, appellant claims for the first time that the wording was inadequate. Given our holding, we need not reach that issue.

6. After the mistrial was denied, the defendant took the stand and, in the process, admitted

to a prior felony conviction. The trial court instructed the jury that the conviction could be used only to assess the defendant's credibility. The appellate court did not rule out the possibility that the instruction on the subject contained in the final instructions might have been adequate to cure the harm, but the final instruction was not included in the record on appeal. The court also utilized a harmless error rule that required certainty.

7. The court was also moved by the inadequacy of the form of the instruction as finally given.

missible.[8] Appellant challenged the trial court's refusal to grant a mistrial. Immediately following the mistrial motion, the trial court denied the mistrial but gave the jury an instruction to disregard that testimony, explaining why it was inadmissible. We said: "The issue is a troubling one, for even an indirect reference to the administration of a polygraph examination has a substantial potential for prejudice. In this case, however, the trial judge's *prompt,* thorough and effective admonition to the jury minimized the possibility of such prejudice[.]" 709 A.2d at 65–66 (emphasis added).[9]

These cases, when taken together, suggest that, short of a mistrial, an immediate instruction may be required, on request, in certain circumstances when highly prejudicial and inadmissible testimony regarding the defendant comes before the jury, albeit accidentally. Further indication of the possible importance of immediate instruction can be found in two somewhat related areas, where the evidence, otherwise inadmissible, nonetheless may be admitted for certain limited purposes.

One such situation, close to the case at hand, is when "other crimes" evidence, otherwise inadmissible, is admitted under one of the exceptions. In *Scull v. United States,* 564 A.2d 1161, 1162 n. 1 (D.C.1989), we considered in footnote dictum other crimes evidence that the appellant, who was convicted of assault with a dangerous weapon and carrying a pistol without a license, had unlawfully carried a firearm for a month prior to the shooting in question. There, we summarily stated that "in the consideration of 'other crimes' evidence ..., it is necessary that the trial court give the jury an *immediate* instruction warning it, among other things, not to consider that evidence as 'tending to show in any other way the defendant's guilt of the offenses for which he is on trial.' " (Emphasis added). To support the assertion, we simply cited to the then current standard Criminal Jury Instruction for the District of Columbia No. 2.49 (3d ed.1978), which at the time stated that "if you decide to accept [this other crimes evidence], you may do so only for the limited purpose[s] that I have just explained and you may not consider it as tending to show in any other way the defendant's guilt of the offense for which he is now on trial." The comments following the notes elaborated on the timing of the limiting instruction:

> As to when this instruction should be given, i.e., just after the introduction of the evidence, in the final charge to the jury, or at both times, the authorities do not suggest a succinct rule. However, the sounder rule seems to be that the instruction should be given *both* immediately after the evidence is introduced to the jury and in the final instructions, unless otherwise requested by the defense.

(Citing cases) (emphasis in original). The cited cases, however, with one exception,[10]

---

8. Our latest ruling to this effect is *Proctor v. United States,* 728 A.2d 1246, *amended by* 747 A.2d 134 (D.C.1999).

9. The opinion cited to a number of cases from other jurisdictions where an immediate instruction had averted the need for a mistrial.

10. In *United States v. Bussey,* 139 U.S.App. D.C. 268, 432 F.2d 1330 (1970), the court stated that the failure to give an immediate *Drew* limiting instruction was error, even

though such an instruction was given in the final instructions. However, in the subsequent case of *United States v. Fench,* 152 U.S.App.D.C. 325, 470 F.2d 1234 (1972), the court explained *Bussey* as resting on the proposition that prejudice of the particular *Drew* evidence involved in that case so outweighed its probative value that it should not have been admissible at all and the final instruction was inadequate to rectify the error.

do not mandate an immediate instruction, nor have we found any other cases in the *Drew* context of limited admissibility squarely addressing the timing issue and coming to the conclusion of *Scull.*[11]

The more recent standard Criminal Jury Instructions for the District of Columbia (4th ed. 1996 Supp.) is even less definitive as to the timing of the instruction. It breaks up other crimes evidence into two sub-parts of Instruction No. 2.51: 1) other crimes evidence admitted to show motive, identity, or common scheme and plan; and 2) other crimes evidence admitted to show intent/absence of mistake or accident. Both parts contain the following limiting instruction:

> You may not consider this evidence for any other purpose. The defendant has not been charged with any offense relating to [describe the other crimes conduct], and you may not consider this evidence to conclude that the defendant has a bad character, or that the defendant has a criminal personality. The law does not allow you to convict a defendant simply because you believe he may have done bad things not specifically charged as crimes in this case.

As to the timing of the instruction, however, the comments following the instruction state: "Beyond announcing the general rule that some cautionary instruction is required, the Court of Appeals has not held specifically when, or how many times in the course of the trial, such an instruction should be given." Indeed, none of the four cases cited following that comment are dispositive on the issue, but it is worth taking note that in each of them such an instruction was given at least twice. The upshot thus appears to be that even in the case of limited *Drew* admissibility, the timing of the limiting instruction could be a relevant factor.[12]

Another situation involving somewhat similar considerations is where a party impeaches its own witness with a prior inconsistent statement. Until the amendment to D.C.Code § 14–102 in 1995, prior inconsistent statements were admitted in these circumstances only where a party was surprised by the testimony of one of its own witnesses and only then to impeach credibility. *Gordon v. United States,* 466 A.2d 1226, 1230–31 (D.C.1983). A bright-line rule had developed that "the trial court is required to give an immediate cautionary instruction when a party impeaches its own witness with prior inconsistent statements, stating that the jury may consider the prior statements only in evaluating the witness' credibility." *Id.*[13]

---

**11.** In *United States v. Gilliam,* 157 U.S.App. D.C. 375, 484 F.2d 1093 (1973), a prior inconsistent statement of a witness was admitted in which she stated that the defendant had made a threatening phone call to her. The court held that it was reversible error not to give an immediate instruction limiting its use to impeaching the credibility of the witness. The court noted, however, that if such an instruction had been given as part of the final instructions, the omission of an immediate instruction might have been harmless error.

**12.** In *United States v. McClain,* 142 U.S.App. D.C. 213, 217, 440 F.2d 241, 245 (1971), the court held, in sweeping terms, that "whenever evidence is admitted only for a limited purpose, it is plain error, in the absence of manifest waiver, to omit an immediate cautionary instruction." However, this holding, decided on January 27, 1971, and thus otherwise binding on us under *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971), was rejected by the en banc court in *(Linwood) Johnson v. United States,* 387 A.2d 1084, 1087 n. 4 (D.C.1978) (noting that the holding had been restricted significantly by subsequent D.C. circuit court decisions) and, even more definitively, in *Gilliam v. United States,* 707 A.2d 784 (D.C. 1998).

**13.** That same case, however, made it clear that failure to give the instruction when not requested by the other party did not mandate automatic reversal.

This principle was reaffirmed in *Jones v. United States,* 579 A.2d 250, 252–53 (D.C. 1990): "a sua sponte cautioning instruction is required when a party, surprised by its own witness, impeaches the witness with a prior inconsistent statement" (citations and internal quotations omitted). As we explained in *Dixon v. United States,* 287 A.2d 89, 99 (D.C.1972), there is a "high probability of jury confusion" where trial counsel "suddenly claimed surprise at his own witness's testimony and was then allowed to introduce for the purposes of impeachment a prior statement made by that very witness inconsistent with what he had just testified to from the stand." [14]

In light of these considerations, we turn to the case before us. While, as explained above, the evidence may not have been so prejudicial as to mandate a mistrial, there is no doubt that the testimony was markedly prejudicial. Appellant's own sister accused him of previously committing, perhaps more than once, the identical crime at the identical place. In *Ford v. United States,* 487 A.2d 580, 591 (D.C.1984), in the context of prior convictions, we stated that "[t]he risk of jury misuse of previous conviction impeachment is at its greatest when, as in this case, the crime charged and the crime used to impeach the defendant are similar." The greater the similarity in the crimes, the greater the suggestion that the defendant has "a propensity to commit the crime charged," which is the prejudice the *Drew* rule seeks to avert. *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989); *see also Fields v. United States,* 396 A.2d 522, 527 (D.C.1978) ("[T]he prosecutor must not impeach the defendant with prior convictions in a manner which suggests to the jury that because of his prior criminal acts, the defendant is guilty of the crimes charged."). Here, the possibility of such misuse continued unchecked through the testimony of four additional and important government witnesses into almost the end of a second day of trial. We conclude that, given all the circumstances of this particular case, the trial court was obliged to acquiesce to the demand of defense counsel for an immediate instruction with respect to the inadmissible evidence. [15]

Accordingly, the judgment of conviction must be vacated and the case remanded for a new trial. [16]

*Reversed and remanded.*

14. In contrast, in *Dixon,* we refused to impose a flat-out requirement in cases of impeachment of a defendant by prior conviction that the trial court give an immediate limiting instruction. We noted that the high probability of jury confusion in the prior inconsistent statement cases was not present in the case of prior convictions evidence used for impeachment. "We are not persuaded that juries which are properly instructed at the conclusion of trial will generally misapprehend in the absence of an immediate cautionary instruction during trial the limited purpose of the prior conviction evidence." 287 A.2d at 99. *Cf. Maura v. United States,* 555 A.2d 1015, 1017–18 (D.C.1989). Likewise, in *(Linwood) Johnson, supra* note 12, we refused to find plain error where no immediate instruction was given when a defense witness was impeached by the government with a prior inconsistent statement.

15. To reemphasize what we have already noted, we believe that in the majority of cases, an instruction given as part of final instructions would be sufficient to avoid jury misuse of improperly admitted evidence or of evidence admitted for a limited purpose. However, to avoid unnecessary issues that may possibly require a new trial, trial judges may well choose to give immediate instructions in such cases where requested by defense counsel.

16. The error here cannot be deemed harmless. The case against the appellant was circumstantial and a defense expert testified at

length about the inadequacies of the government investigation and proof to establish that the fire was intentionally set or to have originated as the government claimed.